FILED
SUPERIOR COURT
OF GUAM

2023 MAR -7 PM 5:52

CLERK OF COURT

By:_____

IN THE SUPERIOR COURT OF GUAM

| | | |
|---|---|---|
| PEOPLE OF GUAM, | ) | CRIMINAL CASE NO. CF0315-22 |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| LEONARDO MANGLONA TOVES II, | ) | DECISION AND ORDER |
| aka "Leo" | ) | RE. DEFENDANT'S MOTION |
| DOB: 08/23/1977 | ) | TO SUPPRESS EVIDENCE |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I.    INTRODUCTION

This matter came before the Honorable Judge Maria T. Cenzon on September 27, 2022 and November 22, 2022 for hearings on Defendant Leonardo Manglona Toves II's (the "Defendant") motion to suppress evidence (the "Motion"). At each hearing, the Defendant was present with his counsel, Attorney Peter Sablan. Assistant Attorney General Katherine Nepton appeared on behalf of the People. After reviewing the parties' briefs, oral arguments, the underlying record, and the applicable case law and statutes, the Court **DENIES** Defendant's Motion as set forth herein.

## II.    BACKGROUND AND FACTUAL FINDINGS

This matter involves a search and seizure that occurred during the early morning hours of December 14, 2021. The following account of the incident was testified to by several witnesses who were Guam Police Department ("GPD") officers who responded to a dispatch call:

At approximately 5:00 AM on December 14, 2021, GPD officers Benjamin Cruz, Troy Pangelinan, Jason Young and J.C. Connor responded to a dispatch call regarding a possible self-inflicted gunshot wound. Hr'g Tr. at 3:48 PM, 4:03 PM (Sept. 27, 2022). They found the Defendant bleeding by the road amid the darkness. *Id.* at 3:47 PM. He was conscious and alert but Officer Cruz observed Defendant to be bleeding "enough to warrant medical attention." *Id.* at 3:48:05. Officer Cruz testified that medics were already *en route* to the scene, but GPD had to secure the premises before the medics could perform treatment. Id. at 3:49:30 PM. Officer Cruz indicated that "securing the scene" involves locating the weapon/firearm involved in the incident as well as any other possible suspects or victims in the event officers needed to triage more people. *Id.* Similarly, Officer Young testified that upon confirming the injury to the Defendant, the officers' first priority was to locate and secure the weapon causing the injury in order to ensure that it is safe for the fire department and others respond without fear that anything else would happen to endanger them while rendering assistance. *Id.* at 4:24:30 PM to 4:24:54 PM. The fire department will not come on an active scene until GPD renders the scene safe. *Id.* at 4:58:12 PM.

Officer Cruz testified that even though the report from dispatch indicated only one person involved in a self-inflicted gun shot wouNd, officers could not assume that this was an accurate representation of the scene. Id. Officer Cruz was concerned with officer safety upon first arriving on the property. *Id.* at 3:40 PM. He attempted to elicit information from the Defendant about the wound (e.g. "is the wound from the gun?", "where is the gun?", and "is anybody else on the property?"), however, the Defendant would not answer his questions. *Id.* at 4:04PM. Instead, he repeatedly asked if he was going to jail and pleaded with the officers to not take him to jail. *Id.* Consequently, Defendant's failure to respond to his initial questions caused officer Cruz to

become concerned that there might be others who might be injured or possible suspects still remaining on the propery. *Id.* at 4:14:00 PM.

Officer Connor stayed with the Defendant while the other officers were searching for the firearm(s) and any other individuals who might be present at the scene. *Id.* at 4:12 PM. Medics arrived while Officers Cruz, Pangelinan and Young were conducting their search and it was during this this time that Defendant admitted to police that he had shot himself. *Id.* at 3:57:17 to 3:57:48 PM.

GPD Officer Jason Young observed blood pooling beside the Defendant. *Id.* at 4:10 PM, 4:26 PM; Hr'g Tr. at 2:11 PM (Nov. 22, 2022). He and Officer Cruz began to follow two separate blood trails (which they described as fresh, as the blood was still wet and of a red color, no signs of congealing, no signs of drying) and they split up when the blood tracks led to two different directions. Officer Cruz was concerned that the trails were made by two separate people. Hr'g Tr. at 4:16:40 PM (Sep. 27, 2022). The blood trail followed by Officer Cruz was formed by penny or dime-sized drops which were about a foot apart from each other, indicating that the person was walking around, while the blood pools which Officer Young tracked were closer together, indicating that the bleeder was in a standing position. *Id.* at 3:55 PM. Officer Young followed one trail that led to the container home, and Officer Cruz followed one trail that led to vegetation. Hr'g Tr. at 3:55 PM, 4:01-02 PM (Sept. 27, 2022).

Officer Young's trail led him to a pool of blood resting at the base of the front door to the container home and blood on the door frame. *Id.* at 4:27 PM. He checked the door knob and "it was open" so when he opened the door, he saw "a lot of blood inside the container." *Id.* at 4:28:00 PM. He testified that he became concerned that there might be a second person who may be a

victim because of the sheer amount of blood he observed. *Id.* at 4:28 PM. Describing how he entered the home, he testified that he drew his gun and knocked two times on the door, calling out: "GPD, is anybody in there?" and then "GPD, I'm coming in!" when he did not hear a response. *Id.* at 4:40-41 PM. Immediately upon entering, Officer Young was confronted by an object he described as a bookshelf or a rack. *Id.* at 4:31 PM. He stepped beside it and then he "ha[d] a view of the whole container." *Id.* He observed "a living room type set up—there was a couch, a tv, some tables, other places to sit but no bed or anything like that and . . . a bullet hole in the wall . . . drugs and needles out in the open and just lots of blood." *Id.* Officer Young testified that he then stepped further into the container to get a better view of the bullet hole and observed "a shell casing on the ground [and] drugs kind of more or less everywhere on various tables and surfaces throughout the container but it was otherwise empty at the time." *Id.* at 4:31-32 PM. Officer Young did not see any people in the container. *Id.* at 4:32 PM. Nor did he see any firearms. *Id.* at 4:35 PM, 4:52 PM.

After securing the container, Officer Young stepped out of the container home and called out to Officer Cruz that there was more blood inside the container home and that he found methamphetamines and "more stuff" inside the home. *Id.* at 4:17:48 PM. Officers Cruz and Pangelinan then went into the container. *Id.* at 4:52 PM. Officer Cruz testified that when he entered the container home, the first thing he did was to look for other persons who may be inside the dwelling because the amount of blood inside the container home appeared to him to indicate that whomever got shot in the dwelling stayed in the dwelling. *Id.* at 4:08:42 PM to 4:12:17 PM. Upon cross-examination by defense counsel, Officer Cruz confirmed that the Defendant did not give oral consent to enter into the container home. Hr'g Tr. at 4:00:40 PM (Sept. 27, 2022).

However, although officers did not hear anyone screaming or calling out for help or chase anyone into the container home, Officer Cruz believed there to be exigent circumstances to enter into the home because the amount of blood which led officers to the home was of an amount sufficient to cause them to believe someone needed medical attention. *Id.* at 4:01:32 PM. By this point, Officer J.C. Connor had gathered information from the Defendant that he had accidentally shot himself and that he had tossed the firearm outside. Hr'g Tr. at 2:09 PM (Nov. 22, 2022). After leading Officer Cruz and Pangelinan to the container, Officer Young assisted in the search for the missing firearm which Defendant referenced. Hr'g Tr. at 4:53 PM (Sept. 27, 2022).

Officers Cruz and Pangelinan remained in the container and Officer Pangelinan observed "a smaller caliber handgun in plain view right on a makeshift table where the drug paraphernalia was located as well." Hr'g Tr. at 2:12 PM (Nov. 22, 2022). Standing from the rear-end of the container looking out towards the entrance, Officer Pangelinan noticed to his left "a rolled-up carpet [with] a firearm protruding out of the rolled-up part." *Id.* at 2:13 PM. The missing firearm with which the Defendant allegedly shot himself was eventually located outside. *Id.* at 2:09 PM. Officer Cruz testified that the items were confiscated at approximately 5:45 AM, approximately 40 - 45 minutes after officers arrived at the scene. Hr'g Tr. at 4:03:33 PM (Sept. 27, 2022).

The Defendant now faces the following charges:

1. Three Counts of POSSESSION OF A FIREARM WITHOUT A FIREARM IDENTIFICATION CARD (As a 3rd Degree Felony)
2. Three Counts of POSSESSION OF AN UNREGISTERED FIREARM (As a 3rd Degree Felony)
3. POSSESSION OF A SCHEDULE II CONTROLLED SUBSTANCE (As a 3rd Degree Felony)
4. TERRORIZING (As a 3rd Degree Felony)
5. FAMILY VIOLENCE (As a 3rd Degree Felony)

6. CRIMINAL MISCHIEF (As a 3rd Degree Felony)
7. VIOLATION OF A COURT ORDER (As a Misdemeanor)

Indictment (May 19, 2022).[1]

The Defendant claims his Fourth Amendment right to be free from unreasonable searches was violated when GPD officers entered and searched his container without a warrant, and that such violation compels the exclusion of all evidence found within the container. *See* Def.'s Br. at 4. Therefore, this Motion exclusively concerns Counts Two and Three of Charges One and Two and Charge Three. The People counter that "[t]he items found in the container should not be suppressed as they were legally discovered by GPD officers" who entered the abode under exigent circumstances. People's Br. at 3-4.

## III.    DISCUSSION

"The Fourth Amendment of the U.S. Constitution protects against unreasonable searches and seizures and is made applicable to Guam by 48 U.S.C.A § 1421b(c) of the Organic Act of Guam." *People v. Yerten*, 2021 Guam 8 ¶ 17 (citing *People v. Johnson*, 1997 Guam 9 ¶ 4) (internal citations omitted). "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' And a principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment . . . ." *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (quoting *United States v. U.S. District Court*, 407 U.S. 297, 313 (1972)). It therefore follows that "[a] warrantless search or

---

[1] The Defendant has filed two motions: the present Motion to suppress and another to sever the charges since they apparently stem from separate incidents. Despite the People's non-opposition to severing the charges, the Defendant requested that the severance motion be held in abeyance to apparently ease plea negotiations, which the Court granted. Hr'g Tr. at 3:38 PM (Sept. 27, 2022).

seizure is presumed to be unreasonable." *People v. Quintanilla*, 2020 Guam 8 ¶ 27 (citing *People v. Chargualaf*, 2001 Guam 1 ¶ 14).

However, the Fourth Amendment prohibits only those searches which are unreasonable. *People v. Superior Ct. (Chapman)*, 204 Cal. App. 4th 1004, 1011, 139 Cal. Rptr. 3d 298, 304 (Cal. 2012) (citing *Florida v. Jimeno* (1991) 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297; see also *Brigham City v. Stuart* (2006) 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 ["the ultimate touchstone of the Fourth Amendment is 'reasonableness'..."].) Thus, while a search conducted without a warrant is *per se* unreasonable under the Fourth Amendment, the requirement is subject to certain exceptions. *Stuart*, 547 U.S. 398, 403 (2006). One of the established exceptions to the warrant requirement is when the entry and search is based upon exigent circumstances. See, *Mincey v. Arizona*, 437 U.S. 385, 390-391, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). An exigent circumstance is "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence." *People v. Ramey* (1976) 16 Cal.3d 263, 276, 127 Cal.Rptr. 629, 545 P.2d 1333; see also *Stuart, supra,* at p. 403, 126 S.Ct. 1943.

Moreover, "[w]here the initial intrusion that brings the police within plain view of . . . an article is supported, not by a warrant, *but by one of the recognized exceptions to the warrant requirement,* the seizure is also legitimate." *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971)(emphasis added). "[T]he People bear the burden of proof when a warrantless search or seizure occurs." *People v. Calhoun*, 2014 Guam 26 ¶ 9 (quoting *People v. Santos*, 1999 Guam 1 ¶ 51).

The Court begins its analysis by determining whether the law enforcement officers' warrantless entry (and reentry) into Defendant's container home was a violation of his Fourth Amendment rights. Should the Court find that the officers did not need a warrant to enter the container home under the specific circumstances of this case, the Court will then consider whether the evidence was lawfully seized under the Plain View Doctrine.

### A. Whether Exigent Circumstances Justified the Warrantless Entry (And Reentry) by Officers into Defendant's Home

A recognized exception to the warrant requirement as articulated by the United States Supreme Court is that "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Warden v. Hayden*, 387 U.S. 294, 298-99 (1967). In recognition of the 'emergency doctrine,' the Ninth Circuit has identified a two-fold test that must be met for a warrantless search exception to be made in the name of personal danger, and it turns on whether:

1. considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and

2. the search's scope and manner was reasonable to meet the need.

*United States v. Snipe*, 515 F. 3d 947, 952 (9th Cir. 2008). In order to determine whether the officers were lawfully in the container home under the emergency doctrine when they observed the drugs and the firearms, the Court will turn to address each part of the two-fold test as dictated in *Snipe*.

//

//

//

## 1. Considering the totality of the circumstances, did officers have an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm?

In determining whether such an entry is objectively reasonable, the Supreme Court has "consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry," and looked to the totality of the circumstances. *United States v. Snipe*, 515 F.3d 947, 953 (9th Cir. 2008)(quoting *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); *accord United States v. Banks*, 540 U.S. 31, 36, 124 S.Ct. 521, 157 L.Ed.2d 343 (2003)("[W]e have treated reasonableness as a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of circumstances in a given case; it is too hard to invent categories without giving short shrift to details that turn out to be important in a given instance, and without inflating marginal ones."). "Reasonableness 'depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" *People v. Calhoun*, 2014 Guam 26 ¶ 12 (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)).

The facts of this case illustrate that, considering the totality of the circumstances, Officer Young possessed an objectively reasonable basis to enter the container without a warrant. Officer Young testified that even though the call was for a self-inflicted gunshot wound, as a trained officer, he could not assume that to be accurate for safety purposes. Hr'g Tr. at 4:22 PM (Sept. 27, 2022). Officer Cruz corroborated this point. *Id.* at 3:48 PM. Officer Young explained that "anything is possible" when arriving upon a scene. *Id.* at 4:24 PM. The officers were attending to a gunshot wound, but the weapon was as of yet unaccounted for. Asked if he felt in danger, Officer Young answered "whenever there's a firearm [involved]? Always." *Id.* at 4:27 PM. Officer Cruz

was concerned about officer safety, too. *Id.* at 3:50 PM. Apart from their own safety, the officers were also concerned others were at risk or may have been injured. Officer Cruz testified that he thought there was another person involved after realizing there were two blood trails. *See Id.* at 4:01-02 PM. Officer Young testified that the amount of blood in front of the door to the container made him believe there was a second person involved. *Id.* at 4:28 PM. Upon entering the container house to secure the premises and ensure that no other individuals were harmed or could cause harm, Officer Young viewed the various items which Defendant now wishes to suppress.

The U.S. Supreme Court's holding in *Michigan v. Fisher*, 558 U.S. 45, 49, 130 S. Ct. 546, 549, 175 L. Ed. 2d 410 (2009), supports a finding that the officers' warrantless entry into the container was reasonable. In *Fisher*, police officers responded to a disturbance call at a residence and arrived to chaos: blood on the hood of a truck and at the entrance of the house, smashed windows, and damaged fenceposts. *Fisher*, 558 U.S. 45 at 45-46. The defendant there answered the door with a bloody hand, refused to answer officers' questions about whether anybody needed medical attention, and refused ("with accompanying profanity") to let them enter without a warrant. When Fisher later moved to suppress any evidence seized during that warrantless search, the Michigan Court of Appeals granted his motion, opining that the situation "did not rise to a level of emergency justifying the warrantless intrusion into a residence" because while "there was evidence an injured person was on the premises . . . the mere drops of blood did not signal a likely serious-life threatening injury." *Id.* at 48 (quoting *People v. Fisher*, 2008 WL 786515 at *2 (Mich. Ct. App. Mar. 25, 2008)).

The Supreme Court soundly rejected the appellate court's reasoning, holding that "[o]fficers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the

emergency aid exception." *Fisher* at 49 (citing to *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404–05, 126 S. Ct. 1943, 1948, 164 L. Ed. 2d 650 (2006)). Moreover, the standard is whether "[a]n action is "reasonable" under the Fourth Amendment, regardless of the individual officer's state of mind, "as long as the circumstances, viewed *objectively*, justify [the] action." *Brigham City* at 404 (citing *Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978) (emphasis in original)). The officer's subjective motivation is irrelevant. *Id.*[2] Here, the exigent circumstances exceed even those found in *Fisher* and *Brigham City*, where the Court held in both cases the warrantless entry by officers was justified.

In *Fisher*, drops of blood signaled to police officers someone might be in need of aid while in *Brigham City* it was a bloody lip. Similarly, upon arriving at the scene of the incident, Officers Young, Cruz and Pangelinan observed a man bleeding profusely from a gunshot wound, two separate blood trails at the site, and a pool of blood in front of the container home which evidenced, in the minds of the officers, that another person might have been injured. Under these circumstances, it was reasonable for Officer Young to enter into the container home without a warrant. That no other person was ultimately found on the property is not determinative of whether their actions were appropriate. *United States v. Velasco*, 849 Fed. Appx. 645, 647-48 (9th Cir. 2021) ("Even if the situation were clear in hindsight [that there was no threat], . . . the police

---

[2] See *Bond v. United States*, 529 U.S. 334, 338, n. 2, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000) ("The parties properly agree that the subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment ...; the issue is not his state of mind, but the objective effect of his actions"); *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("[W]e have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers"); *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ("[O]ur prior cases make clear" that "the subjective motivations of the individual officers ... ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment").

had only a few minutes in which to determine whether a lurking predator or injured person in need of assistance might be [on property].") (alterations in the original) (quoting *United States v. Russell*, 436 F. 3d 1086, 1090-93 (9th Cir. 2006)); *see also Fisher*, 558 U.S. 45 at 49 ("It was error for the Michigan Court of Appeals to replace that objective inquiry into appearances with its hindsight determination that there was in fact no emergency.").

Apart from entering for the sake of the safety of others, the officers were also justified in entering for their own safety. *Warden v. Hayden*, 387 U.S. 294, 298-99 (1967)("Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that [the defendant] was the only man present and that the police had control of all weapons which could be used against them or to effect an escape.") The urgency of police action here was supported by several circumstances. Having already recognized the Defendant needed urgent medical attention, Hr'g Tr. at 3:47 PM (Sept. 27, 2022), Officer Young testified that the fire department and other emergency personnel would not respond until the officers rendered the scene safe to approach. Officer Cruz corroborated this point. *Id.* at 3:51 PM, 4:24 PM, 4:58 PM. It is noteworthy that the officers observed the blood to be a vibrant red color and wet, *see id.* at 3:55 PM, suggesting the emergency was ongoing rather than having occurred in a distant time. Moreover, the Defendant's evasiveness in not answering the officers' questions regarding the location of the gun which caused the injury and whether anyone else was on the property only added to the heightened need to secure the premises immediately and without a warrant. *See United States v. Harris*, 158 Fed. Appx. 719, 724 (6th Cir. 2005) (Finding exigent circumstances partly because "neither [defendant] was providing information that would negate the existence of exigent circumstances and the need to continue the search.").

For these reasons, the Court finds that the officers' entry into the container home without a warrant were justified under the circumstances. The Court next determines whether the officers' manner and scope of their entry was appropriate under the circumstances.

**2. Whether the manner and scope of Officers Cruz and Pangelinan's entry was reasonable.**

"While the first factor considers whether there is a reasonable basis to believe an emergency exists, the second factor necessarily deals with the manner and scope of the search." *United States v. Najar*, 451 F. 3d 710, 720 (10th Cir. 2006). Defendant does not dispute the validity of Officer Young's warrantless entry and his observation of items which would later be seized. Rather, the Defendant argues that, after officers determined that no other person was present and once the premises were secured, the officers should then have obtained a search warrant before re-entering the container. Hr'g Tr. at 4:47 PM (Sept. 27, 2022).

Other than arguing the general principles of law regarding the requirement of a warrant for general searches of property, the Defendant does not cite to any case law to support his argument that, in this case, officers were required to have first secured a warrant before entering (and reentering) the Defendant's container home. Instead, he relies on these general principles of law requiring a warrant for such searches, while recognizing (without further discussion) that exceptions to the warrant do exist. Although the Guam Supreme Court has not passed upon the particular question before the Court in this case, in addition to the cases cited herein, the Court finds as highly persuasive a California Supreme Court case in determining whether the seizure was unconstitutional under the 4th Amendment under the specific facts of this case.

In *People v. Superior Court (Chapman)*, 204 Cal. App. 4th 1004, 139 Cal.Rptr.3d 298 (Cal. Ct. App. 2012), police responded to a call that shots had been fired in Defendant's house.

Upon their arrival at 5:05 p.m. that evening, police observed a crowd of neighbors outside the house yelling that there was somebody shooting inside the house. *Id.* at 1007. Defendant was ordered by police to exit the home and, during the patdown of his body, his girlfriend who had also exited the house with him was screaming hysterically, "Help us, he shot him, he shot him," while pointing to the Defendant. *Id.* Officers conducted a protective sweep to search for suspects or victims who needed aid. This occurred between 2 to 10 minutes after they arrived at the scene and took about 5 minutes to complete. *Id.* The victim's body was found on the floor of the home and he had been shot. A sledgehammer also lay next to him. *Id.* at 1008. The crime scene was described as follows:

> During the sweep, officers observed shell casings on the ground in the kitchen area, bullet holes in the walls, and blood, but did not disturb anything. Paramedics, who had already arrived at the scene, were allowed to enter the house as soon as the protective sweep was over. One of the officers (Officer Lopez) secured the premises by remaining with the body in the house until the coroner arrived much later.
>
> Chapman, who was in one of the police vehicles, was transported to the police station about 5:25 p.m. About 5:45 p.m., two detectives (Porche and Phillips) arrived at the scene and were briefed by the officers standing outside the residence. Porche was advised that a shooting had occurred and a dead body was lying in the house, that Chapman was in custody, and that there were no other victims or suspects in the house.
>
> As a result, Detectives Porche and Phillips immediately entered with one of the officers who had conducted the protective sweep. The officer walked the detectives through the scene. Porche saw a shell casing from a handgun in the kitchen area, strike marks on the wall or refrigerator, a handgun on the floor in the kitchen, and a dead body on the threshold between the kitchen and laundry areas. The handgun was on the kitchen floor about two feet from the body. All of these items were unobstructed and in plain view. The walkthrough took about 30 to 40 minutes. No evidence was disturbed or seized.

*Id.* at 1008. Two hours after this "first wave" of first responders conducted the protective sweep, arrested the Defendant and allowed paramedics to enter the home, a "second wave" of law

enforcement officers (detectives, a photographer, criminalists and coroner) began to arrive, entered the home and proceeded to retrieve evidence, including a shell casing that was found under the dead body of the victim. The "second wave" of law enforcement were at the scene until the early morning hours of the following day. At no time was a search warrant obtained because, as one officer would later testify to, "everything was in plain view." *Id.* at 1009. Defendant was arrested and charged with murder.

Although the Defendant in *Chapman* conceded that all evidence that was retrieved during the "first wave" of officers who conducted the protective sweep was valid based upon exigent circumstances, he moved to suppress the evidence observed or seized by the "second wave" without a warrant. He argued that, although officers in the "first wave" entered the premises pursuant to a lawful emergency, that emergency dissipated at 5:22 p.m., when the victim was pronounced dead, and most definitely by 5:25 p.m., when Defendant was taken into custody. The trial court agreed that the emergency ended before the "second wave" entered into the home and, therefore, suppressed all evidence observed or seized by the "second wave" of responders. *Id.*

On appeal, the Ninth Circuit reversed the trial court's decision, finding evidence lawfully seized upon reentry of the officers when the evidence was initially observed in plain view during a lawful entry but not seized during that initial stage. *Id.* The rationale for their determination was that the officer (who was conducting the protective sweep) "was performing a duty that took priority over seizure of evidence." *Id.* at 1014. Additional basis for this ruling was that there was also an "uninterrupted police presence in the residence" during the relevant time period, citing *People v. Amaya*, 93 Cal.App.3d 424, 431, 155 Cal.Rptr. 783 (Cal. Ct. App. 1979)(the court upheld reentry of detectives to observe and collect evidence observed in plain view about two

hours earlier by the first responding officer because there was effectively an uninterrupted police presence at the residence, the officer could have seized the evidence during the original entry, and it was not unreasonable for police to wait a reasonable time for trained personnel before disturbing lawfully seizable evidence).

Similarly, in *People v. Ngaue*, 8 Cal.App.4th 896, 901-905, 10 Cal.Rptr.2d 521 (Cal. Ct. App. 1992), the court upheld a police reentry into a residence to retrieve a gun seen in plain view when arresting the occupant. The occupant promptly escaped from custody, and the arresting officer turned his attention to containing the area in order to apprehend him, but later called another officer and instructed him to return to the house to retrieve the gun. The appellate court held that the reentry was constitutionally valid under *People v. McDowell*, 46 Cal.3d 551, 564, 250 Cal.Rptr. 530, 763 P.2d 1269 (Cal. 1988), because "there was no intent on the part of the officers to abandon the gun and retrieval of the gun took place without inexcusable delay."

In short, despite the length of time between the arrival and protective sweep conducted by the "first wave" of first responders and the final departure of the last of the "second wave" of responders, the *Chapman* court reversed the trial court's suppression of the evidence collected by the "second wave" without a warrant, but distinguished the retrieval from the case involving a "general exploratory search of a residence, for which a warrant would be required," reasoning "[W]e are presented [in contrast, here] with an *uninterrupted police presence* in the residence and

a close-in-time successive search of areas already validly searched in order to begin processing and collecting evidence observed in plain view." *Id.* at 1020 (emphasis added).[3]

In this case, Officer Young (the "first wave") entered Defendant's abode to ensure no other person was inside that was harmed or could cause harm. As discussed above, the initial warrantless entry was proper for this purpose, and Defendant concedes as such. Although the testimony of the officers was inconsistent relative to the reason each had for entering the container home, the subsequent reentry by Officers Cruz and Pangelinan resulting in the seizure of the additional firearms was also appropriate under *Snipe, Chapman* and numerous other cases cited therein, including those from other jurisdictions.[4] The reentry by the "second wave" of officers here was a close-in-time successive search of the container house which Officer Young had already searched for the purpose of processing and collecting evidence in plain sight does not constitute an unreasonable and additional invasion of privacy. Officer Cruz testified that approximately 45 minutes had lapsed from the time they arrived at the scene to the time that all of the evidence was seized.[5] Therefore, the Court finds that Officers Cruz and Pangelinan's warrantless reentry was not a violation of the Fourth Amendment.

Having determined that the officers' entry and reentry without a warrant was justified under the exception of exigent circumstances, the Court now applies the "plain view" doctrine to

---

[3] The Ninth Circuit engaged in a lengthy discussion of authority from other jurisdictions which have upheld under the Fourth Amendment the warrantless reentry of a home in order to retrieve plain view evidence previously observed during a valid and proximate entry and search. See, *Id.* at 1017 – 1021 (numerous citations omitted).

[4] Officer Young testified that the purpose of Officers Cruz and Pangelinan's reentry (the "second wave") was to confiscate the illegal items, Hr'g Tr. at 4:52 PM (Sept. 27, 2022), while Officer Pangelinan testified that the reason for his reentry was to search for possible suspects or injured persons. Hr'g Tr. at 2:19 PM (Nov. 22, 2022).

[5] Hr'g Tr. at 4:03:33 PM to 4:04:08 PM (Sept. 27, 2022). Even if the evidence was confiscated hours later on the same date of the incident, the Court finds that such reentry and seizure was close in time and was for the purpose of processing and collecting evidence in plain sight.

determine whether the seizure of the evidence was in violation of Defendant's Fourth Amendment rights.

## B. Application of the Plain View Doctrine

The plain view doctrine holds that "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *People v. Camacho*, 2004 Guam 6 ¶ 20 (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)). Having determined that the police officers were in the container home under exigent circumstances which justified their warrantless entry into the container home, the Court now determines whether the plain view doctrine applies in this case.

The Guam Supreme Court has adopted a three-part test as pronounced by the United States Supreme Court to determine when the plain view doctrine applies to evidence confiscated during a warrantless search:

1. [T]he officer must 'arriv[e] at the place from which the evidence could be plainly viewed' without violating the Fourth Amendment;
2. the evidence must be in 'plain view' and its 'incriminating character must also be immediately apparent;' and
3. the officer 'must also have a lawful right of access to the object itself.'

*Id.* (quoting *Horton v. California*, 496 U.S. 128, 136-37 (1990)). The Court now turns to analyze each part of the test in turn.

### 1. The Officers arrived at the place from which the evidence could be viewed without violating the Fourth Amendment.

Having determined that the Officers were within the container home without violating the Defendant's Fourth Amendment rights, above, the Court proceeds to consider the second factor.

## 2. The evidence was in "plain view" and their incriminating nature was immediately apparent.

"The incriminating nature of an item is immediately apparent 'where the officer ha[s] probable cause to associate the property with criminal activity.' " *People v. Camacho*, 2004 Guam 6 ¶ 25 (alteration in the original) (quoting *United States v. Hudson*, 100 F. 3d 1409, 1420 (9th Cir. 1996)). In *Camacho*, the Guam Supreme Court found sufficient probable cause when an officer deduced a white powdery substance in plastic straws was methamphetamine. *See id.* The *Camacho* court also cited a Ninth Circuit decision where that court held that the criminal nature of a defendant possessing a torch and a glass pipe with a white residue was immediately apparent. *Id.* (citing *United States v. Nohara*, 3 F. 3d 1239, 1243 (9th Cir. 1993)).

This Court finds that the testimony of Officers Young, Cruz and Pangelinan supports a finding that the drugs, related paraphernalia and firearms were in plain view and their incriminating character clearly apparent when Young first entered the container home (and exited leaving everything undisturbed) and when Cruz and Pangelinan subsequently reentered the container home lawfully.

## 3. There was a lawful right of access to the drugs.

The lawful right of access factor serves as a gatekeeper, "emphasizing that even though contraband plainly can be seen and identified from outside the premises, a warrantless entry into those premises to seize the contraband would not be justified absent exigent circumstances." *G & G Jewelry, Inc. v. City of Oakland*, 989 F. 2d 1093, 1101 (9th Cir. 1993). Therefore, "[i]t is implicated in situations such as when an officer on the street sees an object through the window of a house, or when officers make observations via aerial photography or long-range surveillance. In those cases the officers cannot use the plain view doctrine to justify a warrantless seizure,

because to do so would require a warrantless entry upon private premises." *United States v. Naugle*, 997 F. 2d 819, 823 (Tenth Cir. 1993), *cert. denied*, 510 U.S. 997 (1993); *see also United States v. Paige*, 136 F. 3d 1012, 1024 (5th Cir. 1998). Because no such problem exists here and because the Court has already found that Officers Young, Cruz and Pangelinan were lawfully in the container when they observed the drugs, paraphernalia and firearms, there was a lawful right of access to the evidence. *See United States v. Santiago*, 410 F. 3d 193, 201 (5th Cir. 2005) ("However, under the facts of this case, this final prong has far less importance in our plan view doctrine calculus because the gun was located in place where the deputies had a lawful right to be.").

In sum, the circumstances surrounding the seizure of the drugs and all firearms pass muster under the *Camacho* analysis. All evidence seized in this case were in plain view when the officers entered into the container home under exigent circumstances.

## IV.    CONCLUSION

For the reasons stated above, the Court hereby **DENIES** Defendant's Motion. Trial dates shall be issued under separate cover.

SO ORDERED this_____**MAR 07 2023**_____.

_____
HONORABLE MARIA T. CENZON
Judge, Superior Court of Guam